# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No.  3:16cr373** |
| | : | |
| **v.** | : | **(Judge Munley)** |
| | : | |
| **CHARLES J. SENKE,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court for disposition is the government's motion in limine to preclude the defendant from using "entrapment" as a defense.  Defendant has raised his intention to use the defense in his omnibus pretrial motion.  The parties have set forth their respective positions, and the issue is ripe for disposition.

## Background

On December 20, 2016, the grand jury indicted the defendant on charges of travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) and online enticement in violation of 18 U.S.C. § 2422(b).[1]  (Doc. 1).

---

[1] Section 2423(b) specifically criminalizes: "**Travel with intent to engage in illicit sexual conduct-**A person who travels in interstate commerce . . . for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both."
Section 2422(b) provides:  "Whoever, using the mail or any facility or means of interstate or foreign commerce. . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life."

The Pennsylvania Attorney General's Office performed an online undercover sting operation attempting to find adults seeking unlawful contact with minors.  No minors were involved in the investigation.  Instead, an agent masqueraded as a minor on the LGBT dating website, Gay.com.  After chatting for a time on the website and through text messages, the defendant and the investigator decided to meet. [2] Authorities arrested defendant when he arrived for the meeting.

Originally, charges were brought in Pennsylvania state court.  Almost two years later, however, the federal government brought the instant charges against the defendant in this court.  The state court charges were dismissed.

On December 20, 2016, the court appointed an assistant federal public defender to represent the defendant.  In February 2017, the court granted defendant's counsel leave to withdraw and allowed the defendant to proceed *pro se*.[3]  Defendant has indicated that he intends to use "entrapment" as a defense in this action.  His argument is that the undercover agent convinced him to engage in activity that he would not otherwise have done.  The government argues that the entrapment defense is inapplicable to this case and has filed a

---

[2] The reason why the Pennsylvania State Attorney General's Office chose to target users of a website which evidently caters to men who have sex with other men is unclear.

[3] Defendant is now represented by court appointed counsel.  However, he represented himself for purposes of this motion.

motion in limine to preclude the defense.  After a careful review, we find that the

defendant should be allowed to present the entrapment defense to the jury.

**Discussion**

No reasonable people can dispute the evils of adult coercion and

enticement of minors over the Internet for purposes of sexual activity.  See

Jacobsen v. US, 503 U.S. 540, 548 (1992) (discussing the evils of child

pornography).  Further, it cannot be disputed that the government may use

undercover agents posing as minors to enforce the laws against such actions.

United States v. Tykarsky, 446 F.3d 458, 464-69 (3d Cir. 2006) (holding that

involvement of an actual minor is not a prerequisite to conviction for actual or

attempted persuasion of a minor to engage in illicit sexual activity or for traveling

for purposes of engaging in illicit sexual activity).

"In their zeal to enforce the law, however, Government agents may not

originate a criminal design, implant in an innocent person's mind the disposition

to commit a criminal act, and then induce commission of the crime so that the

Government may prosecute."  Jacobsen, 503 U.S. at 548.   When the

government does so, "entrapment" may be a defense and "the prosecution must

prove beyond a reasonable doubt that the defendant was disposed to commit the

criminal act prior to first being approached by Government agents."  Id. at 549.

The Supreme Court has explained the elements of "entrapment" as follows:

> [A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct. See *Sherman v. United States,* 356 U.S. 369, 376-378, 78 S.Ct. 819, 822-823, 2 L.Ed.2d 848 (1958); *United States v. Russell,* 411 U.S. 423, 435-436, 93 S.Ct. 1637, 1644-1645, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Predisposition, "the principal element in the defense of entrapment," *Russell, supra,* 411 U.S., at 433, 93 S.Ct., at 1643, focuses upon whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime. *Sherman, supra,* 356 U.S., at 372, 78 S.Ct., at 820; *Russell, supra,* 411 U.S., at 436, 93 S.Ct., at 1645. The question of entrapment is generally one for the jury, rather than for the court. *Sherman, supra,* 356 U.S., at 377, 78 S.Ct. at 823.

Matthews v. United States, 485 U.S. 58, 62-63 (1988).

The government ultimately bears the burden of persuasion with regard to entrapment. The defendant, however, has the burden of production. Therefore, the defendant must present sufficient proof of inducement and lack of predisposition on his part for the government to disprove beyond a reasonable doubt. United States v. Lakhani, 480 F.3d 171, 179 (3d Cir. 2007). Although the issues of "inducement" and "predisposition" are interrelated, we will discuss them separately as much as we can.

The Ninth Circuit Court of Appeals has discussed the defendant's burden as follows:

4

> To raise entrapment, defendant need only point to evidence from which a rational jury could find that he was induced to commit the crime but was not otherwise predisposed to do so. *See United States v. Staufer,* 38 F.3d 1103, 1108 (9th Cir.1994). Defendant need not present the evidence himself; he can point to such evidence in the government's case-in-chief, or extract it from cross-examination of the government's witnesses. The burden then shifts to the government to prove beyond a reasonable doubt that defendant was *not* entrapped. *See Jacobson,* 503 U.S. at 549, 112 S.Ct. 1535.

United States v. Poehlman, 217 F.3d 692, 698 (9th 2015).

To analyze these factors, we must examine the government's actions and the defendant's response to them.

The investigating agent from the Pennsylvania Attorney General's office, Justin M. Leri (hereinafter "investigator" or "agent") placed a profile on what the government describes as a "social networking website".[4] This website, however, was not merely a place for people to make and post messages for family and friends such as Facebook, Instagram, Snapchat, Twitter or a website for professional networking such as LinkedIn. It evidently more of an adult/sexually oriented website for men looking to meet with other men. The site was restricted to only people certifying that they are eighteen years of age.

---

[4] These facts are derived from a CD presented by the government which contained the transcripts of the communications between the defendant and the investigator. Therefore, we will not provide citations to the record.

Thus, to execute their sting, the government did not choose a family friendly all-ages website, but rather an adults-only website evidently aimed at gay men. Then the government created a profile and certified that the investigator was eighteen years old. The government did not submit a copy of the profile so we do not know what else, if anything, it contained.

The defendant contacted the investigator through the website. At that point, the investigator presented himself as an eighteen-year-old man. Defendant's first message indicated that he sought a younger man who was looking for an older wealthier man. "U into generous older men" he asked. The undercover agent said "how old r u I prob to young :(((".[5]

Defendant then again indicated he could be "generous" and the undercover agent presented himself as "I 14 but almost 15 is that ok I j don't want to lie to me n hurt my feeling s". Defendant did not answer the "is that ok" query. Instead he asked for naked pictures and asked about the undercover agent's sexual experience, to which the undercover agent cryptically replied "Ya prob". The defendant sent his photo and requested naked pictures from the undercover agent. He asked the investigator if he liked shopping or money, to which he

---

[5] The messages between the defendant and investigator contain many typographical errors, internet abbreviations, slang and lack of punctuation. Generally, we have not attempted to alter the messages as written. Where we have, we have placed a "sic".

replied, again rather cryptically, "Yes eyes assassination what u buy me lol U r so cute".

The conversation continued in this manner and the defendant sent photos of his possessions, evidently in an effort to impress the investigator with his wealth and ability to spoil him. He continually asked the investigator for photos and about whether he had ever had anal or oral sex with a man. The investigator did not respond at first, then he indicated "Yeahhhhhhh All". Defendant consistently asked the undercover agent what type of sexual encounter he sought as well as for pictures, ostensibly to determine if the undercover agent was "fake".

Eventually defendant said, "Never mind see ya." Then unsolicited, the investigator sent his phone number to the defendant for "texting". The investigator then sent a photo to the defendant and presented it as a photo of himself. The person in the photo does not appear obviously young. In fact, the defendant said, "You don't look that young." Finally, the agent replied "I'm not fake I told u I send y u be so mean to me I thought u liked me This is how I got burned b4 n I lost fell phone and computer same way wowwwww u a playa." Thus, the investigator taunted or challenged the defendant to continue the communications by predicting that the defendant would not talk to him anymore after seeing the photo.

The investigator then sent his email address to the defendant.  A day went by with no contact.  Defendant sent more pictures to the investigator and said "Ur 18 years old right" – arguably a reasonable suggestion based on the profile and photograph.  The investigator stated again that he was fourteen and began working on the defendant's sympathies, accusing the defendant of being "mean".

The next day the defendant tried to contact the agent, but received no response.  Finally, defendant asked again "**U r 18 years old right**  How come u don't talk to me anymore".  The agent responded "U were very mean to me   No I tell u I 14 n u still were mean".  It is not clear what the agent was talking about.  Defendant sent some more messages and finally indicated:  "**I didn't know u were 14 years old ok I have to block u.**"

Instead of giving up the investigation there, the investigator persisted.  He again called the defendant "mean".  He sought to use his phone to send text messages to the defendant, instead of communicating through the website.  Thus, he provided the defendant his phone number and email address.  The agent pleaded with the defendant as follows: "plz don't b mean to me u were really men <sic> to me"  It is not at all clear what the agent is talking about but it is evident that he is attempting to get the defendant to feel sorry for him and continue their communications.

Defendant sent some more requests for naked pictures and asked about the agent's sexual experience.   The agent did not reply.  The defendant finally said "Ok I won't text u no more."

But then two days later, **after the defendant had indicated for at least the second time that their texting was over**, the agent was back accusing the defendant of being the "meanest".  He indicated also that he would only meet the defendant if the defendant brought presents.  The agent requested a video game as the gift.[6]  The defendant then indicated that if the agent **was not eighteen years old then they could not "hook up"**.

They went into further exchanges with the agent indicating that he was not fake, and that he had liked the defendant.  Then when the defendant again accused him of being fake, the agent said "OMG u are the meanest ppl u don't even believe me n I was gonne let u meet me when aunt gone 2 work tmrrw that fine what Eva u want then."  He indicated that he was doing schoolwork to get good grades and then the defendant has to be mean to him.  The defendant did not respond to this shaming from the investigator or the veiled invitation to visit. The communications between the two evidently ended here for approximately a week.

---

[6] Evidently no video game or other gifts were found in the search of defendant's car.

Then on September 15-16, 2014, the agent and the defendant had a short interaction. It is unclear for much of transcript whether the defendant knows with whom he is talking. He stated that he initiated the contact believing the number he was using was for someone else, not the agent. Nevertheless, defendant still asked for naked pictures.

The next day, the defendant stopped communicating with the agent for at least the third time. This period of inactivity lasted for over four months.

Then after this four-month lull, out of the blue, the **agent** again texted the defendant's telephone on January 30, 2015. It appears unclear whether defendant knows to whom he is talking. The defendant asks him twice who he is. He then asks where he knew the agent from. He also asks where he lives. The agent re-introduced himself, but did not initially reveal his age. The defendant then indicates that the agent had previously sent him naked photos. The transcript, however, does not indicate that the agent ever sent naked photos to the defendant. Thus, it is unclear whether the defendant remembers or knows who had texted him. The defendant asks about the agent's sexual experience, and they also talk about meeting. The agent's communications portray him as a sympathetic individual in need of help. He states that his aunt treats him like "shiy" and that he has been having a hard time in school, and getting in fights all

the time.  He also indicates that he is scared to send photos because he might get in trouble.

It was not until well into their conversations of the second day that the agent reminded the defendant – after four and a half months of no communication - that he is "almost 15" years old.  Notably, before he reminded the defendant of his supposed age, he asked the defendant if he had ever hooked up with someone his age.  The defendant indicated that he had married a twenty- year-old, someone decidedly not the agent's pretend age, and not a minor.

The agent again accuses the defendant of being mean and thinking he is fake.  The defendant replies that no  - he loves the agent, and he wants his sweetheart to send him naked photos.  The agent replies "I l u toooooo", which may be interpreted as "I love you too".  The defendant then indicated his wish that the agent was eighteen years of age so that they could get married.  The agent indicates that he would marry the defendant.  **The agent then asks** "R u coming to visit me".

The next time they chatted, **the agent asked "r u coming tmrrw I'm excided lol"** and told the defendant several times that he loved him.  The following day, the agent again asked if the defendant was going to come visit

him.  The agent indicated that he wanted to drive the defendant's car.   Thus, it appears as if the agent has changed his tactics.  Instead of challenging the defendant and calling him "mean" he tells the defendant that he loves him and asks him when he is going to come visit – and not for a sexual meeting perhaps but to drive the defendant's car.

On Tuesday, the defendant asked if the agent could get away Friday morning.  The agent indicated that he was not sure, but that tomorrow (Wednesday) was good.  **At the agent's suggestion**, they planned to meet the next day.  The defendant asked the agent what he liked to do sexually and what his experience was.  The agent responded by asking if the defendant was going to teach him.  The agent keeps expressing fears of getting caught, in response the defendant tells him to delete his messages.  **The agent tells the defendant that he (the defendant) is his boyfriend forever.  The agent then expressed his love for the defendant several times.**

The next day, the agent sent a message indicating that he had just woken up and said, "Hi babe".   The defendant did not respond, so eighteen minutes later, the agent asked the defendant if he is coming and says "I MISS U".  Then when the defendant again failed to respond, the agent said:  "K I guess u broke up" w me I cry in now."  The agent then indicates that he loves the defendant.  When the agent finally responded to the agent forty-five minutes later, the agent

feigns relief and asks the defendant if he is still coming. It appears the defendant is not sure about visiting. He says "if I come" in his next message, indicating he is still not sure. The defendant then highlights non-sexual reasons for the defendant to visit - the agent asks if they can go get food. He says he is "so hungry" and later indicates "I starvinggggggg". Further, he indicates that he seeks to drive the defendant's car. **On this last day of message transcripts there is no sex talk at all**.

Although, we do not have any text message transcripts or emails from February 1, 2015, the affidavit of probable cause indicates that on that day the defendant agreed that he would meet the agent, but that the agent was too young and that they would not have sex.[7] Notably, after this date, the defendant stopped asking the agent for naked photographs.

We must base our entrapment decision upon this background. We will begin with whether the government induced the crime and then whether the defendant was predisposed to commit the crime.

**A. Inducement**

---

[7] Defendant maintains that he did, in fact, say he would refuse to have sex due to the age of the agent's persona. He claims, however, to have said it on February 4, 2015, the day of the meeting and his arrest.

As noted above, the first element of an entrapment defense is whether the government induced the crime. To meet the inducement element, it is not enough to establish the government's "mere solicitation" to commit a crime. United States v. Fedroff, 874 F.2d 17, 185 (3d Cir. 1989). Inducement, however, may take the forms of "persuasion, fraudulent representation, coercive tactics, pleas based on need, sympathy, or friendship." Id.

Defendant certainly has evidence of inducement on the part of the government – the undercover agent accessed an adults-only website and created a phony profile on which he claimed to be eighteen years old. He pretended to be friends with/in love with the defendant and at certain points accused the defendant of being "mean" to him by losing interest in pursuing the relationship.[8]

The investigator used other coercive tactics also. For example, he contacted the defendant several times after the defendant indicated he did not wish to continue to speak with the investigator. Further, the investigator contacted the defendant **months** after he had last heard anything from him. The defendant and the investigator had contact on twelve different days on both the

_____

[8] At least this interpretation is reasonable regarding the exchange of messages between the defendant and the undercover agent. The messages are written in such a way, however, that they are not always easy to interpret.

website and in text messages.[9]  The first four days, the defendant initiated

contact.  The remaining times they had contact, it was initiated by the

investigator.[10]  Based upon this evidence, the defendant could easily establish

"inducement" to commit a crime.

## B.  Non-disposition to commit a crime

The second element of the entrapment defense is a non-predisposition on

the part of the defendant to commit a crime.  With regard to this element the

Third Circuit Court of Appeals has indicated:  "[T]he element of non-predispositon

to commit the offense is the primary focus on an entrapment defense.  It is a

relatively limited defense that may defeat a prosecution only when the

Government's deception actually implants the criminal design in the mind of the

defendant."  United States v. Lakhani, 480 F.3d 171, 178-79 (3d Cir. 2007)

(internal quotation marks and citations omitted).  To prove predisposition, some

of the relevant factors the government may address are:

---

[9] We make this calculation based on the transcripts that the government
provided.  It appears, however, that these transcripts are incomplete.  It also
appears that the investigator and the defendant engaged in email
communications.  The government has presented no emails to the court.  The
reason the government does not have all the evidence in this case is unclear.
No doubt the government sought to examine all of the evidence that the state
investigation revealed to enable it to make an informed decision as to whether to
use its discretion to bring charges.

[10] That is if we ignore the one day where defendant initiated contact and claimed
it was a mistake.

"(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." Id. at 179 (internal quotation marks and citations omitted). Some factors that the Third Circuit suggest for consideration in making the predisposition analysis are:

The character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated government inducement or persuasion; and the nature of the inducement or persuasion supplied by the government. Id.

In the instant case, the government has not presented any evidence that defendant has a prior criminal record, and it has not presented any evidence of an already formed design on the defendant's part to commit the crime for which he is charged. It appears that the defendant had a clearly designed plan to visit an adults-only website and convince a younger individual there to engage in an intergenerational relationship of some sort by telling the younger man that he would be "generous" to him. Those actions are not necessarily illegal. No

evidence indicates that he went onto the adults-only website seeking a minor. Contrariwise, the fact that he was on an adults-only dating website, as opposed to a website that permitted people younger than eighteen years of age, indicates that he did not seek a minor.

The government, in a sense, made the initial suggestion of the criminal activity at issue merely by going to an adults-only dating website and creating a profile. The defendant contacted someone who he thought was an eighteen-year-old, evidently with the goal of meeting a younger man to "spoil" for an intergenerational romantic/sexual relationship. As set forth above, the transcripts of the chats between the defendant and the investigator evidence a hesitancy on the part of the defendant and a disbelief that the investigator really was fourteen years old. The defendant told the investigator several times that he was through talking with him because he was "too young". When the defendant indicated that he was through communicating with him, the investigator repeatedly tried to induce or persuade the defendant to continue their online relationship with statements like "Y r u so mean to me I am nuttin bu nice to u" and "Omgggggggggg u r the meanest" and "OMG u are the meanest ppl…" This situation is not a case of a defendant contacting someone who appeared to be underage and then manipulating and grooming that person into a meeting.

The government finds it significant that the defendant sent numerous "pictures of all the things any 14-year old boy would enjoy, like a muscle car, a quad, a motorcycle, a lake cabin, and a jet ski." (Doc. 51, Govt's Mot. In Limine at 13). We find that this does not necessarily indicate a willingness on the part of the defendant to commit the crimes at issue. It can be argued that the photos were not aimed to appeal specifically to a minor, but actually were meant to establish that the defendant was rich and able to "spoil" a younger guy.[11] The photos were sent very, very early in the conversation as if the defendant had them at the ready to send to anyone who would talk to him. He was on a website that did not allow minors, thus, it can be presumed the photos were not "at the ready" to lure minors. Regardless, the photos are of objects that any man might enjoy regardless of age and are not age specific to minors.

The government also argues that the defendant "with no prompting, immediately engaged in sexually explicit language of what he wanted to do to the boy and how he wanted to do it." (Doc. 51, Govt's Mtn. In Limine at 14). The defendant did immediately engage in sexually explicit language. The

---

[11] It may be questionable whether "any 14-year old boy" would enjoy these things in the photos. A fourteen-year old would be too young to drive a car or motorcycle, and might not have much interest in a cabin/camp. The investigator highlighted and acted excited, about one of the objects, a quad, that is, an all terrain four-wheeled vehicle. Defendant, however, immediately told him that he had sold it.

investigator, however, was on an adults-only website where the immediate use of such language may have been the norm.  Contrary to the government's assertions, the language was used primarily to determine what the investigator was looking for, not what he (the defendant) sought.  The government's argument of predisposition on this point is unconvincing.   The investigators made a phony profile on an adults-only, perhaps sexually charged, gay website where explicit talk early in a conversation may in fact be common and now attempt to link such talk to a predisposition on the defendant's part to lure minors.  Moreover, it is not clear how many different people the defendant was chatting with as he also chats with the agent.  He appears sometimes confused as to with whom he is chatting.

The government indicates that the defendant "pounced at the opportunity to entice a child to engage in sexual activity."   (Doc. 51, Govt's Mtn. In Limine at 14).   The messages presented by the government do not support this conclusion.  Several times, the defendant appeared to stop communicating with the investigator only to be drawn back in when the investigator played upon his sympathies.  For example, the investigator called the defendant mean for not wanting to continue talking after he saw his photo, and he called the defendant "mean" for other unclear reasons.  Eventually, the investigator switched to the

tactic of professing his love for the defendant.  These were all enticements or luring on the part of the investigator, not on the part of the defendant.

The government further states:  "The defendant was sexually explicit in his desires and dangled toys to lure a child."  (Id.)  This statement by the government may not be the best interpretation of the evidence.  The defendant sent no photos of literal "toys" - such as the video games the investigator suggested that the defendant buy him.  As addressed above and in footnote 9, the pictures were of objects that do not seem directed specifically to appeal to a minor.

Further, the government sees an evil design in the fact that the defendant had asked the investigator to delete their communications.  The transcripts reveal, however, that the investigator led the defendant to tell him to delete the messages.  The investigator told the defendant that he did not want to get in trouble with his aunt.  Only after that did the defendant tell him to delete the messages.

The prosecution further argues that the defendant's "own words and conduct . . . prove that he was eager to seduce a child."  (Id.)  Perhaps this assertion is true when viewed with the eyes of a prosecutor.  However, it could also be argued that the transcripts reveal a man who was eager to ask for naked photos and the sexual history of the investigator and then was eager to move on

when they were not forthcoming. The investigators own words and conduct as discussed above may prove to a jury that the investigator was eager to entrap the defendant. In fact, the defendant never indicated he was seeking a minor. He asked the investigator several times if he was actually eighteen years old, and told the investigator multiple times that no sex would take place unless he was over eighteen years of age. Moreover, the investigator tried to lead the defendant into admitting he had had illicit sex with minors in the past. The defendant did not admit he had ever done, or ever desired to do, anything sexual with a minor. He did state he had married a twenty-year-old man. He did not demonstrate any particular enthusiasm in finding someone who was allegedly a minor.

Also to establish propensity, the government indicates that defendant sent the agent photographs depicting other young boys engaged in sexual acts. We ordered the government to explain when the photographs were sent and to describe the content of the photos with more specificity as to the sexual acts. In response, the government provided the pictures at issue. The government did not state when the photographs were sent beyond indicating that they were transmitted by the defendant to the undercover agent either via the gay.com website or via the text messages. Nothing in the transcripts the government provides shows where the photos were sent. The defendant denies ever sending

the photos.  He admits that they may have been on his computer, but he avers that he never sent them.  (See Def. Exhibit from the Sept. 14, 2017).

The government also calls the images "potentially child pornography" and at a hearing the prosecutor referred to the images as "child pornography".  (Doc. 88, N.T. 9/15/17 at 5).  A review of the pictures reveals three that involve sexual activity.  The subjects of the photographs are youthful looking men – but no evidence indicates that they are minors.  In two of the pictures men are evidently engaged in anal sex.  In another picture men are engaged in oral sex.  Nothing illegal is pictured unless, of course, the men are in fact minors.   But more important for our analysis here, the government has not established when, or indeed if, defendant sent these photos to the agent.  Thus, they do not weigh in our review one way or the other.

**Conclusion**

For the reasons set forth above, we find that ample evidence exists that the government induced the defendant to commit a crime that he was not predisposed to commit.   The defendant encountered an agent of the Pennsylvania Attorney General's Office masquerading on an LGBT dating website. The agent posed as an eighteen-year-old who later revealed he was actually posing as a fourteen-year-old.  The defendant evidently was on the website, which did not allow minors, to find a younger man for a relationship of

some sort.  He sent pictures of himself and also pictures of his possessions to establish that he could "spoil" a younger man.   In return, he sought naked pictures of the agent to determine if the agent was not "fake".  It appears that the defendant assumed they were both on the website to find someone to date in the real world, and thus did not engage in a lot of conversation trying to entice or lure the agent to meet.   Such an assumption might be reasonable on a dating website.  Defendant grew reluctant to continue with the agent when the agent reiterated that he was only fourteen years old.  He stopped chatting with the agent, only to be re-contacted again and again.  At one point, a period of over four months passed without the defendant contacting the agent.  Then the agent contacted him.  He played on the sympathies of the defendant, and eventually they set up a meeting.  A jury could find from these facts, that the government entrapped the defendant.   Accordingly, the government's motion in limine to preclude the entrapment defense will be denied.  An appropriate order follows.


Date: <u>September 19, 2017</u>                                  <u>s/ James M. Munley</u>
                                                          **JUDGE JAMES M. MUNLEY**
                                                          **United States District Court**